# United States District Court

**SEALED**

**FILED**

EASTERN DISTRICT OF CALIFORNIA

JUL 15 2010

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY_____
DEPUTY CLERK

In the Matter of the Search of

| | |
|---|---|
| **Computer Systems Owned and Maintained by Yahoo! Inc., 701 First Ave., Sunnyvale, California 94089** | **APPLICATION AND AFFIDAVIT FOR SEARCH WARRANT** |

CASE NUMBER:

**2** 10 - SW - 0290 KJN

I, **Derek Stigerts**, being duly sworn depose and say:

I am a Special Deputy US Marshal, and have reason to believe that on the property or premises known as

**Yahoo! Inc., 701 First Ave., Sunnyvale, California 94089**

in the Eastern District of California there is now concealed a certain property, namely

**See attachments A and B**

that is and contains

**evidence, contraband, and fruits and instrumentalities of crime**

concerning a violation of **Title 18, United States Code, Section 1591**. The facts to support a finding of Probable Cause are as follows:

**See attached Affidavit**

Continued on the attached sheet and made a part hereof.          (X) Yes          ( ) No

_____
Derek Stigerts, Special Deputy US Marshal

Sworn to before me, and subscribed in my presence

July 15, 2010
Date

at Sacramento, California
City and State

Honorable Kendall J. Newman
United States Magistrate Judge
Name and Title of Judicial Officer

_____
Signature of Judicial Officer

_____ AUSA Carolyn K. Delaney

## EASTERN DISTRICT OF CALIFORNIA
## SACRAMENTO, CALIFORNIA

### AFFIDAVIT

I, Derek Stigerts, being duly sworn, depose and state:

1. I am a sworn police officer with the Sacramento Police Department and have been since January 1991. I am currently assigned to the FBI's Innocence Lost Task Force, which primarily investigates sexual exploitation of children through prostitution. I have been deputized as a Special Deputy US Marshal since January 2007. I have attended numerous hours of instruction on child prostitution and the victims of such crimes. During my tenure on the task force, I have conducted and participated in numerous investigations of criminal activity, including cases involving juvenile prostitution and the sex trafficking of children.

2. As a Special Deputy US Marshal, I am authorized to investigate violations of laws of the United States and to execute warrants issued under the authority of the United States.

3. I am currently conducting a criminal investigation regarding the sex trafficking of children in violation of Title 18, U.S.C. § 1591.

4. This affidavit is made in support of an application for a Search Warrant pursuant to Title 18, U.S.C. § 2703(a) and 2703(b)(1)(A) and 2703(c)(1)(A) to require Yahoo! Inc. (hereinafter "PROVIDER"), an electronic communications service provider, located at Yahoo! Inc., 701 First Avenue, Sunnyvale, California 94089, to provide the contents of electronic communications that were placed or stored in the PROVIDER computer systems in directories of files owned or controlled by the account listed below, one of its customers or subscribers, at any time after August 1, 2009, up through and including the date of this search warrant. Based on the investigation in this case, evidence concerning the sex trafficking may be contained in the opened and unopened e-mails in the files owned or controlled by the e-mail account caachapman@yahoo.com (hereinafter "SUBJECT ACCOUNT").

5. The statements in this affidavit are based in part on information provided to me by other law enforcement officers, police reports, other FBI agents and on my own investigation of this matter.

1

1    Since this affidavit is being submitted for the limited purpose of securing a search warrant, I have
2    not included each and every fact known to me concerning this investigation. I have only set forth
3    the facts that I believe are necessary to establish probable cause to believe that evidence, fruits, and
4    instrumentalities of the violation of 18 U.S.C. § 1591 (a) (1) and (a)(2) relating to sex trafficking of
5    children are present at the locations to be searched.

**DESCRIPTION OF TERMS**

6. Internet Protocol (IP) addresses are described as a unique numeric address used by computers on the
   Internet. An IP address looks like a series of four numbers, each in the range 0-255, separated by
   periods (e.g., 121.56.97.178). Every computer attached to the Internet must be assigned an IP
   address so that Internet traffic sent from and directed to that computer may be directed properly from
   its source to its destination. Most Internet service providers control a range of IP addresses. When
   an ISP or other provider uses dynamic IP addresses, the ISP randomly assigns one of the available IP
   addresses in the range of IP addresses controlled by the ISP each time a user dials into the ISP to
   connect to the Internet. The customer's computer retains that IP address for the duration of that
   session (i.e., until the user disconnects), and the IP address cannot be assigned to another user during
   that period. Once the user disconnects, however, that IP address becomes available to other
   customers who dial in at a later time. Thus, an individual customer's IP address normally differs
   each time he dials into the ISP. A Static IP address is an IP address that is assigned permanently to a
   given user or computer on a network. A customer of an ISP that assigns static IP addresses will have
   the same IP address every time.

7. Most services offered on the Internet assign users a name or ID, which is a pseudonym that computer
   systems use to keep track of users. User names and IDs are typically associated with additional user
   information or resources, such as a user account protected by a password, personal or financial
   information about the user, a directory of files, or an email address.

**YAHOO! INFORMATION**

8. Based on my training, experience and information from other law enforcement personnel, I have

2

1    learned the following about YAHOO!:

2        a.  Yahoo is a company that is responsible for providing an e-mail service whereby an

3            individual can receive and send e-mail using a third party dial-up, DSL, cable and/or

4            satellite service. Subscribers register with an ISP that provides the subscriber the

5            capability to use e-mail and access the Internet;

6        b.  An e-mail address is made up of a combination of letters and/or numbers followed by an

7            "@" symbol, followed by a domain name. In this case, the domain name is "yahoo.com"

8            and any e-mail address with the yahoo.com domain is maintained by Yahoo.

9        c.  Yahoo maintains electronic records pertaining to the individuals and companies for

10           which they maintain accounts. These records include account access information, e-mail

11           transaction information, and account application information;

12       d.  The registered owner may access his/her Web site account from any computer connected

13           to the Internet located anywhere in the world using the password;

14       e.  Any e-mail that is sent to a person having an account registered with Yahoo is stored in

15           the subscriber's "mail box" until the subscriber deletes the e-mail or the subscriber's

16           mailbox exceeds the storage limits preset by Yahoo. If the message is not deleted by the

17           subscriber, the account is below the maximum limit, and the subscriber accesses the

18           account periodically, that message can remain on Yahoo's servers indefinitely;

19       f.  When the subscriber sends an e-mail, it is initiated at the user's computer, transferred via

20           the Internet to Yahoo's servers, and then transmitted to its end destination. Subscribers

21           have the option of saving a copy of the e-mail sent. Unless the sender of the e-mail

22           specifically deletes the e-mail from the Yahoo server, the e-mail can remain on the

23           system indefinitely. The sender can delete the stored e-mail message thereby eliminating

24           it from the e-mail box maintained at Yahoo, but that message will remain in the

25           recipient's e-mail box unless the recipient deletes it as well or unless the recipient's

26           account is subject to account size limitations;

27       g.  A Yahoo e-mail subscriber can store files, including e-mails and image files, on servers

28           maintained and/or owned by Yahoo; and

                                    3

h. E-mails and image files stored on a Yahoo server by a subscriber may not necessarily be located in the subscriber's home computer. The subscriber may store e-mails, image files, and/or other files on the Yahoo server for which there is insufficient storage space in the subscriber's computer and/or which he/she does not wish to maintain in the computer in his/her residence. A search of the files in the computer in the subscriber's residence will not necessarily uncover the files that the subscriber has stored on the Yahoo server.

## STATUTORY AUTHORITY

9. This investigation concerns alleged violations of 18 U.S.C. § 1591 (a)(1) and (a) (2), relating to sex trafficking of children.

10. This Court has jurisdiction to issue the requested warrant pursuant to 18 U.S.C. 2703(a) because it is "a court with jurisdiction over the offense under investigation."

11. Pursuant to 18 U.S.C. 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.

## BACKGROUND ON PROSTITUTION AND THE USE OF THE INTERNET TO FURTHER PROSTITUTION

12. Through my training and experience, I am aware of the following traits of prostitution and how the Internet is used to further the activities of illegal prostitution:

a. Individuals who, through enticement, intimidation, or force, enlist individuals to become prostitutes, and who profit from the prostitution of others are called "pimps." Pimps are sometimes euphemistically referred to as "management."

b. Pimps, as well as, prostitutes who are not "managed" have embraced the internet as a means of advertising services and communicating with customers.

c. Certain web sites have been created to facilitate communications between prostitutes and their clients. The more notable web sites relevant to prostitution in the Eastern District of California include "myredbook.com" (also called "myredbook" or "redbook"), and the "Adult Services" section of "Craigslist." These web sites allow pictures to be posted as

4

part of advertisements.  I have viewed prostitution advertisements on each of these web sites.

d.  Subjects who utilize the internet to post prostitution related advertisements on websites such as "sfredbook.com" often use photographs in the advertisements.  These photographs often show a nude or semi-nude female.   These females are at times, under the age of 18 years old.

e.  Advertisements for prostitutes often contain codes for the services provided.  For example the term "w4m" means women for men.   The term "in-calls only" refer that the prostitute will be providing the location for the sexual transaction.  The term "donation" is often used to mean the cost for the sexual transaction.

f.  Pimps attempt to avoid the attention of Law enforcement through the high anonymity provided by the Internet.

g.  Most juvenile prostitutes have pimps.  Prostitutes will often refuse to divulge the identity of their pimps to law enforcement.  Most pimps often instruct the prostitutes on what to say and what not to say to law enforcement.

h.  Prostitutes are instructed by the pimp on how to detect undercover officers.  When arranging "dates" with clients over the phone, prostitutes rarely discuss the details pertaining to the sexual acts that are to occur until they meet in person.

i.  The pimps at times use physical force and/or fear to control the prostitutes.  They control the prostitutes' actions, and collect monies earned through acts of prostitution.  The pimps facilitate the prostitution by transporting the prostitutes to locations where the prostitution occurs.  The pimps, at times, transport prostitutes across state lines for the purpose of prostitution.

j.  Prostitutes and/or pimps often stay in motels/hotels while traveling. The prostitutes and pimps travel via rental vehicles, vehicles, airplane, or bus during their travels.  The pimps utilize the monies earned during acts of prostitution to purchase food, lodging, clothing and other items.

k.  Pimps often possess firearms to assist in protecting their prostitutes.

5

l. The pimps sell drugs as another means to make money. The pimps often provide drugs to the prostitutes to suppress their appetites and to assist with the demands of prostituting for long periods of time.

m. The term "daddy" is commonly used by prostitutes when referring to their pimps. The pimps' phone number is often programmed as "daddy" in the prostitutes cell phone.

n. Pimps often request or force their prostitutes to obtain tattoos of names and/or symbols that are related to the pimp's name or nickname.

o. Prostitutes utilize cellular telephones as a way to be contacted by clients. These phone numbers are included in the advertisements that are posted on various prostitution assisting web sites. Contact is made through phone calls as well as text messages.

p. Pimps and their prostitutes communicate with each other through cellular phones regarding prostitution activity. Communication is made through phone calls as well as text messages.

q. Pimps and their prostitutes use cellular telephone cameras to take photographs of the prostitutes used in the prostitution advertisements.

r. Pimps and their prostitutes use cellular telephones to transmit photographs to email accounts and/or prostitution assisted internet sites.

s. Pimps and prostitutes use personal e-mail accounts to post their advertisements on prostitution assisting web sites.

## BACKGROUND OF INVESTIGATION

1. On June 23, 2010, the Innocence Lost Task Force, which combines Special Agents of the FBI and Detectives with the Sacramento Police Department, conducted an undercover operation targeting juveniles that are exploited through prostitution.

2. Prior to the operation, internet advertisements were located on the website myredbook.com as possible targets of the undercover operation. Myredbook.com is a website which promotes and advertises prostitution. Several juveniles have been recovered by this task force by conducting undercover operations which were advertised on this website.

6

3. Detective Sergeant Werner of the Sacramento Police Department was provided a prostitution advertisement which featured a female by the name of Anglee who was using the phone number 910-5328. Sergeant Werner called the phone number and spoke to a female who identified herself as Anglee.

4. Anglee directed Sgt. Werner to the Good Nite Inn (located at 25 Howe Ave., Sacramento, CA) and told him to call her when he was in the parking lot. She further told him she would be wearing a black dress. She asked Sgt. Werner if he was a police officer and he stated he was not.

5. Other Detectives with the Sacramento Police Department were secreted within the parking lot of the Good Nite Inn when Sgt Werner entered the lot. Sgt Werner called the same number to advise Anglee that he was entering the parking lot at the motel. A different female answered the phone and identified herself as Anglee. She directed Sgt Werner to park at the back (north) of the motel.

6. Sgt Werner parked and immediately noticed a silver Pontiac Grand Prix backed into a parking stall. He observed a female, black, adult subject in the front passenger seat who was monitoring the parking lot. Sgt Werner advised me via a one-way transmitting device of the presence of the Grand Prix and the occupant. I advised all other surveillance units of the Pontiac Grand Prix.

7. Anglee appeared on the second floor and made contact with Sgt Werner. She escorted him to room 220 where she soon agreed to exchange sex for money. An arrest team entered the room and made contact with Anglee who was identified as L.A. who was a 14 year old female (hereinafter referred to as "Victim"). She was found to have a juvenile misdemeanor warrant.

8. The Pontiac Grand Prix was parked in a location where room 220 was visible to the occupant.

9. I advised surveillance units to contact the occupants in the Grand Prix.

10. Detectives made contact with the occupants in the vehicle. When contacted, the front passenger, identified as Deanijinique Cail, had an open lap top computer on her lap. A rear, driver's side occupant, identified as Veraniquie Wallace, was also contacted.

11. Wallace was the registered owner of the Pontiac, CA license # 6JHK425, and she gave detectives consent to search the vehicle. Wallace advised the lap top Cail was using was hers, Wallace's, and that she had a cell phone in the car. She advised her cell phone number was 910-5328. Detectives could not locate Wallace's cell phone and she stated it was not on her person.

7

1   12. Detectives found a Samsung, full keyboard, cell phone on the front seat of the Grand Prix which Cail
2       identified as hers. Wallace also advised the phone belonged to Cail.

3   13. Wallace and Cail were checked for warrants and probation status. Cail was found to be on state
4       searchable probation and was found to have warrants for her arrest. Wallace was clear for warrants
5       and probation.

6   14. The room receipt was obtained from Good Nite Inn employees and it showed room 220 was
7       registered to Veraniquie Wallace.

8   15. In a brief statement, the Victim advised she had her own cell phone which was not the 910-5329
9       number and that she was there with the two females in the silver Grand Prix parked in the parking
10      lot. She identified the two females as Nikki (Wallace) and Daisy (Cail).

11  16. I secured Victim's cell phone and located the phone number to the phone which was 916-889-2827.
12      I located the names Daisy, 916-968-4984, and Nikki 916-910-5328. I determined that Nikki's
13      (Wallace's) phone was actually the phone Victim was posted under. I called the phone from my
14      phone and it went directly to voice mail.

15  17. I was advised by detectives at the Grand Prix that Wallace was the owner of the phone number 916-
16      910-5328 but they could not locate the phone. Due to Victim's statement, room 220 being rented by
17      Wallace, and Wallace's phone number being used to advertise Victim, Wallace was taken into
18      custody for State of CA charges.

19  18. A search was done of Wallace at the scene and $310 was located in her bra. She was told to shake
20      her pants while her legs were spread, and a cell phone fell out of her pants.

21  19. An internet search of myredbood.com using the 910- 5328 produce a more current advertisement. In
22      the advertisement were six photos, five of which were clearly Victim.

23  20. A search of Wallace's cell phone incident to arrest confirmed the phone number was 916-910-5328.
24      There were also several photos of Victim in the phone which matched the advertisement photos
25      including photos showing Victim's genitalia.

26  21. All participants were transported to the Sacramento Police Department's substation located at 300
27      Richards Blvd, Sacramento, CA for interviews.

28  22. Descriptions of the two prostitution advertisements were as follows:

8

a. Advertisement 1 had six photos.  Photo 1 was of Victim kneeling on a bed wearing only leopard underwear and bra.  Photo 2 was of Victim lying on a bed, face up, wearing a black top.  Victim's vagina was clearly visible.  Photo 3 was a close up of a vagina with fingers touching the vagina (later identified by Victim as hers).  Photo 4 was of Victim naked on her knees, on a bed, with her hands on her head.  Photo 5 was of victim lying naked on her side with her leg bent and open and her left hand above her head.  Photo 6 was of Victim kneeling naked on a bed with her legs open and her right hand touching her breast.

Text in the advertisement identified the Victim as Anglee and her phone number being 910-5328.  An email address of caachapman@yahoo.com was associated with the ad.  There was a physical description of the Victim, a rate of $140 for the hour, and Sacramento as the incall location.  The following was the text:

"Hey my name is Anglee am new to redbook, Am a 20 year old Anglee lookin to have a good time with a new friends!Im am such a naughty person but sweet Angle who wants to have some fun!So if u want to be wit an angle and have wings to fly free holla at me, PLEASE NO BLOCKED CALLS OR TEXT MESSAGES PLEASE THANK YOU..!"

b. Advertisement 2 had six separate photos.  Photo 1 was of Victim sitting on a motel bathroom counter wearing a red lingerie top.  Her legs were open with her right hand on her inner thigh and her left arm above her head.  Photo 2 was of Victim naked in a shower facing the camera.  Her arms were above her head.  Photo 3 was the same as photo 3 in section a. above.  Photo 4 was the same as photo 4 in section a. above.  Photo 5 was of Victim naked lying on her left side with her right hand touching her vagina.  Victim had a white object in her mouth while holding the object with her left hand.  Photo 6 was the same as photo 6 in section a. above.

Text was identical to advertisement 1 above except the rate was $170 for the hour.

23. Once at the Sacramento Police Station, Victim told affiant the following in summary:

a. Victim stated she officially met Cail and Wallace on 6/21/2010 at Cail's apartment which was located at 1520 Morse Ave #125, Sacramento, CA.  She was with a friend that she

9

did not want to identify because he was not involved. Cail and Wallace talked to her about working as a prostitute. After the victim agreed to work as a prostitute, Cail or Wallace took photographs of her using an unknown cellular phone, including close up photos of her vagina with her fingers touching it. The photos were to be used to post prostitution advertisements.

b. Cail and Wallace attempted to post Victim on myredbook.com to advertise her as a prostitute. Cail and Wallace were unable to post her due to not having internet access so they took her to a motel where they could use the free internet. The motel was the Best Value Inn located on Watt Ave in Sacramento, CA. They drove in Wallace's silver Grand Prix.

c. They were having trouble posting her on the internet, so they had her walk Watt Ave, which is a known prostitution stroll. Victim was contacted by "tricks" (customers of prostitutes) but did not engage in prostitution acts. All 3 left and drove back to Cail's apartment.

d. On the morning of 6/22/2010, all three drove to Cail's mother's house where Victim was successfully posted on the internet for prostitution.

e. Wallace drove Victim and Cail back to the Best Value Inn located at 4325 Watt Ave. Wallace rented a room on the 3rd floor for Victim to work out of. The advertisements were put under Wallace's phone.

f. Both Wallace and Cail took several provocative photos of Victim using Wallace's phone. The photos were used for posting advertisements. Several calls were received that Wallace, Cail, and Victim answered. Tricks advised that they would not come to that location because it was dangerous. Also, the room was very dirty so Wallace got a refund from the motel after staying a short time.

g. After leaving, they drove to the Good Nite Inn, 25 Howe Ave, Sacramento, CA and Wallace rented a room. Several more photos were taken in room 220 by Wallace and Cail using Wallace's phone.

h. Tricks called and set up prostitution dates. Victim had 5-6 dates which all included

10

1    exchanging sex for money. Victim gave all money earned from prostitution to Cail and
2    Wallace.

3        i. Wallace and Cail were told by her friend that she was 15 years old. Victim also let slip
4           that she was only 14 years old in front of Wallace and Cail.

5    24. Victim identified photos of Wallace (whom she knew as Nikki) and Cail (whom she knew as Daisy).
6    She identified all the photos in the two prostitution advertisements as being of her, including several
7    which showed photos of her genitalia.

8    25. I showed several photos which were located in Cail's phone to Victim. She identified all photos as
9    her. One photo was of Victim's rear end clearly showing her anus and vagina. The phone showed
10   that several of the photos were sent to Cail's phone by a contact named "Chris" with a phone number
11   of 510-712-4479. Victim acknowledged that "Chris" was the friend she was with when she met Cail
12   and Wallace. She did not want to elaborate further. Some photos of Victim were sent from Cail's
13   phone to Wallace's phone.

14   26. Explicit photos of the victim were sent from Cail's phone to the email address
15   caachapman@yahoo.com. The email address is the same that was posted on the prostitution
16   advertisements.

17   27. "Chris'" phone number was in Wallace's phone under the name C Note and in Victim's phone under
18   Main. Victim was in Cail's phone under the name Anglee.

19   28. There were text messages in Cail's phone between Cail and Victim which including prostitution
20   related messages.

21   29. Cail and Wallace were subsequently booked into Sacramento County Jail for state pimping,
22   pandering, and child pornography charges.

23   30. A manager was contacted at the Best Value Inn located at 4325 Watt Ave, Sacramento, CA. He
24   provided a receipt which showed Wallace rented room 301 at the motel on 6/22/2010 and received a
25   refund the same day.

26   31. On 6/24/2010, I contacted the manager, Stacy Conrad, of the apartment complex that Cail lived at,
27   1520 Morse Av, Sacramento, CA. I confirmed that Cail lived in apartment 125 and asked Conrad if
28   she knew an acquaintance of Cail by the name of Chris or C Note. She immediately identified

11

1  Christian Dotson who lived in apartment 103.  She advised Dotson was on the lease of the apartment
2  and currently resided there.

3  32. On 6/25/2010, I recontacted Victim at juvenile hall.  She stated some things she told me in the initial
4  interview were not true.  She advised her friend "Chris" actually was the one who talked to her about
5  working as a prostitute and talked her into it.  Chris was also the one who took the initial explicit
6  photos of her, including the two showing close ups of her genitals using a cell phone.  Chris sent the
7  explicit photos to Cail or Wallace who were going to post Victim on the internet for prostitution.

8  33. I showed Victim a photo of Christian Dotson, DOB 1/29/1991, and she positively identified him as
9  the person who took the initial photos of her and lived in apartment 103.

10 34. On 6/28/2010, I responded to 1520 Morse Ave and recontacted Stacy Conrad.  I showed her a photo
11 of Dotson and she positively identified him as the resident of #103.  I also showed her a photo of
12 Victim and she identified her as a juvenile whose brother used to live in the complex.  She stated she
13 has seen Victim and Dotson together of several occasions.

14 35. Dotson was on state juvenile searchable probation and I obtained a key from Conrad.  I and Task
15 Force members conducted a probation search of apartment 103.  There was no one home at the
16 apartment.  Photos were taken of the apartment including those in the bedroom which matched the
17 background in the photos taken by Dotson.

18 36. On 6/30/2010, I took custody of Victim from juvenile hall to conduct an interview which was video
19 taped.  When beginning the interview, Victim asked if Dotson, Wallace, and Cail would see the
20 video.  When I advised her it was possible, she became very reluctant.  She stated she did not want
21 to talk about Dotson on video but would talk about Wallace and Cail.  She stated Dotson was not
22 like Wallace and Cail.

23

24  ### PROBABLE CAUSE STATEMENT FOR SEARCH WARRANT

25 13. Based upon my training and experience, and my investigation in this case, I have learned the
26 following:

27      a.  I know that pimps and their prostitutes use computers and other electronic means to
28          further their prostitution activities.

12

1        b. On the myredbood.com prostitution advertisements, I observed on both ads, which

2            featured photos of Victim, the email account caachapman@yahoo.com, as a way for

3            customers to contact Victim for prostitution activity. I observed in the outbox of Cail's

4            cellular phone, photos of Victim which were used in the prostitution ads, sent to the email

5            account caachapman@yahoo.com.

6        c. I know that emails and other electronic evidence that may be present within an email

7            account will be retained within that account until deleted by the user or purged by the

8            email provider. In this case, preservation letters were sent to Yahoo, Inc., for the account

9            caachapman@yahoo.com pending a search warrant.

10       d. For these reasons, I believe that there is probable cause to believe evidence of a crime in

11           the server memory associated with the SUBJECT ACCOUNT, described in Attachment

12           A, and that evidence is more fully described in Attachment B.

13   14. Therefore, based upon this Affidavit, I respectfully request authority to search the business

14           records maintained by Yahoo! Inc., 701 First Avenue, Sunnyvale, California 94089, for

15           the content of wire and electronic communications, in particular information associated

16           with the account caachapman@yahoo.com.

17

18   **INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED**

19   15. I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular

20   18 U.S.C. 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrant to require YAHOO! Inc.

21   to disclose to the government copies of the records and other information (including the content of

22   communications)-identified in Attachment A for the items described in Attachment B.

23

24   **SCOPE OF SEARCH**

25   16. I know from my training and experience that the complete contents of e-mail accounts may be

26   important to establishing the actual user who has dominion and control of an e-mail account at a

27   given time. E-mail accounts may be registered in false names or screen names from anywhere in the

28   world with little to no verification by the service provider. They may also be used by multiple

13

1  people. Given the ease with which email accounts may be created under aliases, and the rarity with

2  which law enforcement has eyewitness testimony about a defendant's use of an email account,

3  investigators often have to rely on circumstantial evidence to show that an individual was the actual

4  user of a subject account. Only by piecing together information contained in the contents of an

5  account may an investigator establish who was the actual user of an account. Often those pieces will

6  come from a time period before the account was used in the criminal activity. Limiting the scope of

7  the search for information showing the actual user of the account would, in some instances, prevent

8  the government from identifying the user of the account and, in other instances, prevent a defendant

9  from suggesting that someone else was responsible. Therefore, the content of a given account,

10  including the e-mail accounts that send messages to a given subject account, often provides

11  important evidence regarding the actual user's dominion and control of an e-mail account. For the

12  purpose of searching for e-mail content demonstrating the actual user of the account, I am requesting

13  a warrant requiring the YAHOO, Inc. to turn over all of the contents of the account without a date

14  restriction for review by the filter team.

15  17. Relatedly, to comply with its obligations under Brady v. Maryland, 373 U.S. 83 (1963), the

16  government must be allowed to seize and review the entirety of an account to determine whether

17  other individuals had access to the account. If the government were constrained to review only a

18  small subsection of an email account, that small subsection might give the misleading impression

19  that only a single user had access to the account.

20  18. I also know based on my training and experience that criminals discussing their criminal activity

21  may use slang, short forms (abbreviated words or phrases such as lol to express "laugh out loud"), or

22  codewords (which require entire strings or series of e-mail conversations to determine their true

23  meaning) when discussing their crimes. They can also discuss aspects of the crime without

24  specifically mentioning the crime involved. In the electronic world, it is even possible to use

25  pictures, images and emoticons (images used to express a concept or idea such as a happy face

26  inserted into the content of an e-mail or the manipulation and combination of keys on the computer

27  keyboard to convey an idea, such as the use of a colon and paren :) to convey a smile or agreement)

28  to discuss matters. "Keyword searches" would not account for any of these possibilities, so actual

14

1    review of the contents of an email account by law enforcement personnel with information regarding

2    the identified criminal activity is necessary to find all relevant evidence within the account.

3    19. As set forth in the search protocol below, I am requesting a warrant that permits the filter team to

4    keep the original production from the PROVIDER under seal until the investigation is completed

5    and, if a case is brought, that case is completed through disposition, trial, appeal, or collateral

6    proceeding:

7         a. I make that request because I believe it might be impossible for the PROVIDER to

8            authenticate information taken from the account as its business record without the

9            original production to examine.  Even if the PROVIDER kept an original copy at the time

10           of production (against which it could compare the results of the filter team's search at the

11           time of trial), the government cannot compel the PROVIDER to keep a copy for the

12           entire pendency of the investigation and/or case.  If the original production is destroyed,

13           it may be impossible for the PROVIDER to examine a particular document found by the

14           filter team and confirm that it was a business record of the PROVIDER's taken from the

15           SUBJECT ACCOUNT.

16        b. I also know from my training and experience that many email accounts are purged as part

17           of the ordinary course of business by Internet Service Providers ("ISPs").  For example, if

18           an email account is not accessed within a specified time period, it – and its contents – will

19           be deleted.  As a consequence, there is a risk that the only record of the contents of an

20           email account might by the production that an ISP makes to the government if, for

21           example, a defendant is incarcerated and does not (or perhaps cannot) access his or her

22           email account.  Preserving evidence would, therefore, ensure that the government can

23           satisfy its Brady and other discovery obligations and give the defendant access to

24           evidence that might be used in his or her defense.

25

26                                    **SEARCH PROCEDURE**

27    20. On June 23rd, 2010, I sent to the PROVIDER a preservation letter requesting that the records and

28    contents of the SUBJECT ACCOUNT be preserved for 90 days pursuant to 18 U.S.C. § 2703(f).

                                              15

1    Except for non-content records that I received pursuant to an Administrative Subpoena, I have made

2    no attempts to acquire from the PROVIDER the information requested in this warrant. In particular,

3    I have made no effort through other process to acquire the content records requested in this warrant.

4    I. Execution of the Search Warrant

5    21. Based on the foregoing, I request that the Court issue a search warrant to the PROVIDER for the

6    SUBJECT ACCOUNT in accordance with 18 U.S.C. § 2703 as follows:

7        a.  The search warrant will be presented to personnel of the PROVIDER, located at Yahoo!

8            Inc., 701 First Avenue, Sunnyvale, California 94089, who will be directed to isolate

9            those accounts and files described in Section II below.

10       b.  In order to minimize any disruption of computer service to innocent third parties, the

11           PROVIDER's employees and/or law enforcement personnel who are not involved in the

12           investigation of the crimes described in the affidavit (the "filter team") and who are

13           trained in the operation of computers will create an exact duplicate of the computer

14           accounts and files described in Section II below, including an exact duplicate of all

15           information stored in the computer accounts and files described therein.

16       c.  If the PROVIDER's employees create the duplicate, the PROVIDER's employees will

17           provide the exact duplicate in electronic form of the accounts and files described in

18           Section II below and all information stored in those accounts and files to the filter team.

19       d.  The PROVIDER will send the information via facsimile and United States mail, and

20           where maintained in electronic form, on CD-ROM or an equivalent electronic medium

21           to:

22           Special Agent Rebecka Brown
             Federal Bureau of Investigation
23           4500 Orange Grove Avenue
             Sacramento, California 95841
24           (Direct: 916-481-9110; Facsimile 916-977-2300).

25
26       e.  Once the information described in Section II below is received, the filter team may

27           immediately provide the investigating agents with the records described in Sections II(c),

28           (d), and (e) and III(b) (including all sub-paragraphs), below (hereinafter, collectively the

             "non-content records") for use in the investigation. These non-content records are being

                                            16

1    requested in this search warrant pursuant to 18 U.S.C. § 2703(c)(A); however, they are

2    also producible without a search warrant pursuant to the procedures at 18 U.S.C.

3    2703(c)(B).

4    f.   With respect to the contents of electronic communications as described in Sections II(a),

5         (b), and III(a) (hereinafter, collectively, the "content records"), the filter team will

6         examine the content records to extract and seize any data that falls within the list of items

7         to be seized set forth herein. The filter team will seize and retain only content records

8         that fall within the scope of the items to be seized under this warrant. Absent an

9         additional warrant or further order of the Court, the filter team will not seize or retain,

10        whether as being in plain view or for any other reason, content records that do not fall

11        within the scope of the items to be seized under this warrant.

12   g.   In searching the content records, the filter team will only use search protocols specifically

13        designed to identify items to be seized under this warrant.

14   h.   The filter team will not disclose to this affiant or any other investigating agent, or any

15        Assistant United States Attorney involved in this investigation, any content records other

16        than those that are seized because they fall within the scope of the items to be seized

17        under this warrant except with prior Court authorization. In the event that there exists

18        evidence of a crime within the content records not falling within the scope of this

19        warrant, that is, evidence in plain view of another crime not specifically described within

20        this affidavit, the filter team will not disclose that evidence to the investigating agent

21        absent an additional warrant or further order of the Court. Such information may be

22        disclosed to an independent agent not connected to this investigation for further

23        investigation by that independent agent.

24   i.   The filter team will complete its search of the content records as soon as is practicable but

25        not to exceed 60 days from the date of execution of this warrant. If additional time is

26        needed, the government may seek an extension of this time period from the Court within

27        the original 60-day period from the date of execution of the warrant.

28   j.   Once the filter team has completed its review of the content records and created copies of

17

1          the items seized pursuant to the warrant, the original production from the PROVIDER

2          will be sealed -- and preserved by the filter team for authenticity and chain of custody

3          purposes -- until further order of court.

4    II. Files and Accounts to be Copied by the Provider's Employees

5    22. The PROVIDER will provide the following in accordance with this search warrant:

6        a. All electronic mail stored and presently contained in, or on behalf of,

7           caachapman@yahoo.com, the SUBJECT ACCOUNT, including received messages, sent

8           messages, deleted messages, and messages maintained in trash or other folders, as well as

9           all photo and briefcase folders;

10       b. All existing printouts from original storage of all of the electronic mail described above

11           in Section II(a);

12       c. All transactional information of all activity of the SUBJECT ACCOUNT described

13           above in Section II(a), including log files, dates, times, methods of connecting, ports,

14           dial-ups, and/or locations;

15       d. All business records and subscriber information, in any form kept, pertaining to the

16           SUBJECT ACCOUNT described above in Section II(a), including applications,

17           subscribers' full names, all screen names associated with the subscribers and/or accounts,

18           all account names associated with the subscribers, methods of payment, telephone

19           numbers, addresses, and detailed billing records; and

20       e. All records indicating the services available to subscribers of the SUBJECT ACCOUNT

21           described above in Section II(a).

22    III. Information to be Seized by Law Enforcement Personnel

23    23. Evidence and fruits of violations of 18 U.S.C. § 1591 (a) and (b) will be seized by law enforcement

24    from the SUBJECT ACCOUNT upon receipt of the information from the PROVIDER as described

25    in Section II above as follows:

26       a. The contents of wire and electronic communications, including attachments and stored

27           files, for the SUBJECT ACCOUNT, including received messages, sent messages, deleted

28           messages, messages maintained in trash or other folders, as well as all photo and

18

1   briefcase folders; and all existing printouts from original storage of all of the electronic

2   mail described above in Section II(a) –

3       i.  tending to demonstrate the actual user(s) of the SUBJECT ACCOUNT;

4       ii.  the contents of electronic communications that were placed or stored in the

5           PROVIDER computer systems in directories of files owned or controlled by the

6           account identified as caachapman@yahoo.com ("SUBJECT ACCOUNT"), for

7           the time period June 1st , 2010 to June $23^{rd,}$ 2010; and

8       iii.  information necessary for establishing the context (as described in paragraph 51

9           above) of the contents described above in Section III(a)(ii).

10    b.  All of the records and information described above in Sections II(c), (d), and (e),

11      including:

12      i.  Account information for the SUBJECT ACCOUNT including:

13          1.  Names and associated e-mail addresses;

14          2.  Physical address and location information;

15          3.  Records of session times and durations;

16          4.  Length of service (including start date) and types of service utilized;

17          5.  Telephone or instrument number or other subscriber number or identity,

18             including any temporarily assigned network address;

19          6.  The means and source of payment for such service (including any credit

20             card or bank account number); and

21          7.  Internet Protocol addresses used by the subscriber to register the account

22             or otherwise initiate service.

23      ii.  User connection logs for the SUBJECT ACCOUNT for any connections to or

24          from the SUBJECT ACCOUNT.  User connection logs should include the

25          following:

26          1.  Connection time and date;

27          2.  Disconnect time and date;

28          3.  Method of connection to system (e.g., SLIP, PPP, Shell);

4. Data transfer volume (e.g., bytes);The IP address that was used when the user connected to the service;

5. Connection information for other systems to which user connected via the SUBJECT ACCOUNT, including:

    a. Connection destination;

    b. Connection time and date;

    c. Disconnect time and date;

    d. Method of connection to system (e.g., telnet, ftp, http);

    e. Data transfer volume (e.g., bytes); and

    f. Any other relevant routing information.

c. Source or destination of any wire or electronic mail messages sent from or received by the SUBJECT ACCOUNTS, and the date, time, and length of the message; and

d. Any address to which the wire or electronic mail was or is to be forwarded from the SUBJECT ACCOUNT or e-mail address.

24. I ask that the Court order the PROVIDER to deliver the information set forth above within 10 days of the service of this warrant and that the PROVIDER send the information via facsimile and United States mail to the filter team member described above.

## CONCLUSION

25. Based on the foregoing, there is probable cause to believe that the contents of the wire and electronic communications pertaining to the SUBJECT ACCOUNT are evidence, fruits and instrumentalities of criminal violations of 18 U.S.C. § 1591(a) and (B).

26. Wherefore, based on the foregoing, and the facts as set forth in this affidavit, your affiant has probable cause to believe that on the computer systems in the control of YAHOO! Inc., there exists evidence of a crime and fruits of a crime. Accordingly, a search warrant authorizing a search of the location described in Attachment A for the items listed in Attachment B utilizing the procedures detailed in Attachment C is requested.

20

DEREK STIGERTS
Deputy Special US Marshal
Innocence Lost Task Force

Approved as to form.

CAROLYN K. DELANEY
Assistant United States Attorney

Subscribed and sworn to me this ___15___ day of
July, 2010

KENDALL J. NEWMAN
United States Magistrate Judge
Sacramento, California

21

1

2

**ATTACHMENT A**

**Place to be Searched**

3       This warrant applies to information associated with caachapman@yahoo.com, the SUBJECT

4   ACCOUNT, for the period June 1st, 2010 to June 23rd, 2010 that is stored at premises owned,

5   maintained, controlled, or operated by YAHOO! Inc., a company headquartered at 701 First Avenue,

6   Sunnyvale, California 94089.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

22

1

## ATTACHMENT B

2

### Particular Things to be Seized

3      To the extent that the information described in Attachment A is within the possession, custody,

4  or control of YAHOO! Inc., YAHOO! Inc. is required to disclose the following information to the

5  government for the SUBJECT ACCOUNT listed in Attachment A:

6  Files and Accounts to be Provided by Yahoo! Inc.

7          a. All electronic mail stored and presently contained in, or on behalf of,

8              caachapman@yahoo.com, the SUBJECT ACCOUNT, including received messages, sent

9              messages, deleted messages, and messages maintained in trash or other folders, as well as

10             all photo and briefcase folders;

11         b. All existing printouts from original storage of all of the electronic mail described above

12             in Section (a);

13         c. All transactional information of all activity of the SUBJECT ACCOUNT described

14             above in Section (a), including log files, dates, times, methods of connecting, ports, dial-

15             ups, and/or locations;

16         d. All business records and subscriber information, in any form kept, pertaining to the

17             SUBJECT ACCOUNT described above in Section (a), including applications,

18             subscribers' full names, all screen names associated with the subscribers and/or accounts,

19             all account names associated with the subscribers, methods of payment, telephone

20             numbers, addresses, and detailed billing records; and

21         e. All records indicating the services available to subscribers of the SUBJECT ACCOUNT

22             described above in Section (a).

23  Information to be Seized by Law Enforcement

24         a. The contents of wire and electronic communications, including attachments and stored

25             files, for the SUBJECT ACCOUNT, including received messages, sent messages, deleted

26             messages, messages maintained in trash or other folders, as well as all photo and

27             briefcase folders; and all existing printouts from original storage of all of the electronic

28             mail described above –

23

1       i. tending to demonstrate the actual user(s) of the SUBJECT ACCOUNT;

2       ii. the contents of electronic communications that were placed or stored in the

3          PROVIDER computer systems in directories of files owned or controlled by the

4          account identified as caachapman@yahoo.com ("SUBJECT ACCOUNT"), for

5          the time period June 1st, 2010 to June 23rd, 2010; and

6       iii. information necessary for establishing the context (as described in paragraph 51

7          above) of the contents described above in Section III(a)(ii).

8    b. All of the transactional, business, and subscriber records and information including:

9       i. Account information for the SUBJECT ACCOUNT including:

10          1. Names and associated e-mail addresses;

11          2. Physical address and location information of registration and logins;

12          3. Records of session times and durations;

13          4. Length of service (including start date) and types of service utilized;

14          5. Telephone or instrument number or other subscriber number or identity,

15             including any temporarily assigned network address;

16          6. The means and source of payment for such service (including any credit

17             card or bank account number); and

18          7. Internet Protocol addresses used by the subscriber to register the account

19             or otherwise initiate service.

20       ii. User connection logs for the SUBJECT ACCOUNT for any connections to or

21          from the SUBJECT ACCOUNT. User connection logs should include the

22          following:

23          1. Connection time and date;

24          2. Disconnect time and date;

25          3. Method of connection to system (e.g., SLIP, PPP, Shell);

26          4. Data transfer volume (e.g., bytes);

27          5. The IP address that was used when the user connected to the service;

28          6. Connection information for other systems to which user connected via the

SUBJECT ACCOUNT, including:

    a.  Connection destination;

    b.  Connection time and date;

    c.  Disconnect time and date;

    d.  Method of connection to system (e.g., telnet, ftp, http);

    e.  Data transfer volume (e.g., bytes); and

    f.  Any other relevant routing information.

7. Source or destination of any wire or electronic mail messages sent from or received by the SUBJECT ACCOUNT, and the date, time, and length of the message; and

8. Any address to which the wire or electronic mail was or is to be forwarded from the SUBJECT ACCOUNT or e-mail address.

c.  All records indicating the services available to subscribers of the SUBJECT ACCOUNT.

**ATTACHMENT C**

**Search Procedure**

The procedure to be used by Yahoo! Inc. in executing this search warrant will be as follows:

a. The search warrant will be presented to personnel of the PROVIDER, located at Yahoo! Inc., 701 First Avenue, Sunnyvale, California 94089, who will be directed to isolate information associated with caachapman@yahoo.com, the SUBJECT ACCOUNT, for the period June 1st, 2010 to June 23rd, 2010 those accounts and files described in Attachment B below.

b. In order to minimize any disruption of computer service to innocent third parties, the PROVIDER's employees and/or law enforcement personnel who are not involved in the investigation of the crimes described in the affidavit (the "filter team") and who are trained in the operation of computers will create an exact duplicate of the computer accounts and files described in Section II below, including an exact duplicate of all information stored in the computer accounts and files described therein.

c. If the PROVIDER's employees create the duplicate, the PROVIDER's employees will provide the exact duplicate in electronic form of the accounts and files described in Section II below and all information stored in those accounts and files to the filter team.

d. The PROVIDER will send the information via facsimile and United States mail, and where maintained in electronic form, on CD-ROM or an equivalent electronic medium to:

Special Agent Rebecka Brown
Federal Bureau of Investigation
4500 Orange Grove Avenue
Sacramento, California 95841
(Direct: 916-481-9110; Facsimile 916-977-2300).

e. Once the information described in Section II below is received, the filter team may immediately provide the investigating agents with the records described in Sections II(c), (d), and (e) and III(b) (including all sub-paragraphs), below (hereinafter, collectively the "non-content records") for use in the investigation. These non-content records are being requested in this search warrant pursuant to 18 U.S.C. § 2703(c)(A); however, they are

26

also producible without a search warrant pursuant to the procedures at 18 U.S.C. 2703(c)(B).

f.  With respect to the contents of electronic communications as described in Sections II(a), (b), and III(a) (hereinafter, collectively, the "content records"), the filter team will examine the content records to extract and seize any data that falls within the list of items to be seized set forth herein.  The filter team will seize and retain only content records that fall within the scope of the items to be seized under this warrant.  Absent an additional warrant or further order of the Court, the filter team will not seize or retain, whether as being in plain view or for any other reason, content records that do not fall within the scope of the items to be seized under this warrant.

g.  In searching the content records, the filter team will only use search protocols specifically designed to identify items to be seized under this warrant.

h.  The filter team will not disclose to this affiant or any other investigating agent, or any Assistant United States Attorney involved in this investigation, any content records other than those that are seized because they fall within the scope of the items to be seized under this warrant except with prior Court authorization.  In the event that there exists evidence of a crime within the content records not falling within the scope of this warrant, that is, evidence in plain view of another crime not specifically described within this affidavit, the filter team will not disclose that evidence to the investigating agent absent an additional warrant or further order of the Court.  Such information may be disclosed to an independent agent not connected to this investigation for further investigation by that independent agent.

i.  The filter team will complete its search of the content records as soon as is practicable but not to exceed 60 days from the date of execution of this warrant.  If additional time is needed, the government may seek an extension of this time period from the Court within the original 60-day period from the date of execution of the warrant.

j.  Once the filter team has completed its review of the content records and created copies of the items seized pursuant to the warrant, the original production from the PROVIDER

27

1     will be sealed -- and preserved by the filter team for authenticity and chain of custody

2     purposes -- until further order of court.

AO 93  (Rev. 01/09) Search and Seizure Warrant

# SEALED NITED STATES DISTRICT COURT

for the

Eastern District of California

| | |
|---|---|
| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched* | ) |
| *or identify the person by name and address)* | ) Case No. |
| Computer Systems Owned and Maintained by Yahoo! Inc., 701 First Ave., Sunnyvale, California 94089 | ) 2 1 0 - ﬆ - 0 2 9 0  KJN |

## SEARCH AND SEIZURE WARRANT

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the _____ **Eastern** _____ District of _____ **California** _____ *(identify the person or describe the property to be searched and give its location)*:

**See Attachment A**

The person or property to be searched, described above, is believed to conceal *(identify the person or describe the property to be seized)*:

**See Attachment B**

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property.

**YOU ARE COMMANDED** to execute this warrant on or before _____ **July 25, 2010** _____
*(not to exceed 10 days)*

☑ in the daytime  6:00 a.m. to 10 p.m.      ☐ at any time in the day or night as I find reasonable cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to United States Magistrate Judge
_Kendall J. Newman or the on-duty Magistrate Judge_____ .
_____*(name)*

☐ I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*  ☐ for _____ days *(not to exceed 30)*.
      ☐ until, the facts justifying, the later specific date of _____ .

Date and time issued:    07/15/2010 3:30pm _____

City and state:    Sacramento, California _____

_____
*Judge's signature*

KENDALL J. NEWMAN, U. S. Magistrate Judge
*Printed name and title*

AO 93 (Rev. 01/09) Search and Seizure Warrant (Page 2)

| Return | | |
|---|---|---|
| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |
| Inventory made in the presence of : | | |
| Inventory of the property taken and name of any person(s) seized: | | |

| Certification |
|---|
| I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge. |

Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*